JEWELCOR INCORPORATED, Plaintiff,

v.

Leonard D. PEARLMAN et al., Defendants.

LAFAYETTE RADIO ELECTRONICS CORPORATION, Plaintiff,

v.

JEWELCOR INCORPORATED et al., Defendants.

Nos. 75 Civ. 537, 74 Civ. 5518.

United States District Court, S. D. New York.

May 6, 1975.*

* Although this opinion did not issue until May 6; an order incorporating its conclusions was signed by Judge Stewart April 25.

Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff in No. 74 Civ. 5518; for defendants in No. 75 Civ. 537; Henry P. Wasserstein, Thomas J. Schwarz, Edward J. Yodowitz, Timothy A. Nelsen, Jonathan J. Lerner, Kenneth A. Plevan, Douglas M. Kraus, Richard A. Fuchs, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendants in No. 74 Civ. 5518; for plaintiff in No. 75 Civ. 537; Dennis J. Block, Neal Schwarzfeld, Robert A. Weiner, Kenneth Lemberger, Mitchell Zuckerman, New York City, of counsel.

## OPINION

STEWART, District Judge:

"Federal courts," we noted last year, "have become a common arena in which tender offer battles are waged." Missouri Portland Cement Corp. v. Cargill, Inc., 375 F.Supp. 249, 251 (S.D.N.Y. 1974) (Stewart, J.), aff'd in part and rev'd in part, 498 F.2d 851 (2d Cir.), cert. denied, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). These actions bring to the federal judicial arena a pretender offer battle involving alleged violations of the federal securities laws. Basically, they involve a claim by Lafayette Radio Electronics Corporation ("Lafayette") that Jewelcor, Incorporated ("Jewelcor") and its officers have commenced a plan to acquire control of Lafayette by illegal and improper means, and a counter allegation by Jewelcor against various Lafayette directors and officers ("Lafayette directors") that they improperly and unlawfully engaged in a scheme or "battle plan" to thwart any attempt by Jewelcor to obtain control of Lafayette.

Lafayette's action against Jewelcor is brought pursuant to Section 27 of the Securities Exchange Act of 1934 ("the

Exchange Act"), 15 U.S.C. § 78aa, to enjoin alleged violations of Sections 13 (d) and 14(a) of that Act, 15 U.S.C. §§ 78m(d) and 78n(a), and the rules and regulations of the Securities and Exchange Commission ("SEC") promulgated thereunder, in connection with Jewelcor's purchase of approximately 9.8 percent of the shares of Lafayette's common stock and the solicitation by Jewelcor of Lafayette's shareholders in connection with Lafayette's adjourned annual meeting of shareholders. More specifically, Lafayette alleges that Jewelcor and its officers violated the federal securities laws by misrepresenting their actual purpose in purchasing Lafayette stock—to strengthen Jewelcor's position in merger discussions with Lafayette's management—by stating that the shares were purchased "for the purpose of investment;" by misrepresenting the source of the funds used for the purchase of the Lafayette stock—borrowed funds—by asserting that Jewelcor's "general assets and working capital" were expended; and by misrepresenting the outcome of a proxy solicitation by stating that a certain proposal was defeated when in fact it had not been voted on.

In this action, Lafayette seeks to enjoin preliminarily defendants Jewelcor, its president Seymour Holtzman, and its vice presidents Frank P. Cuscela and Leonard M. Shendell, and all persons acting on their behalf from: (a) acquiring or attempting to acquire in any manner any shares of stock of Lafayette; (b) voting any stock or proxies or consents of Lafayette held or acquired after the initiation of the alleged plan, combination, or conspiracy of the defendants, other than in favor of the pending second proposal at Lafayette's adjourned annual stockholders meeting; and (c) soliciting any proxies or consents from any shareholders of Lafayette or utilizing in any fashion whatsoever any proxies or consents heretofore acquired other than in favor of the pending second proposal.

Jewelcor and its officers, opposing this motion for a preliminary injunction, have themselves moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("F.R.Civ.P.") on the ground that since there are no issues of material fact, they are entitled to judgment as a matter of law. Jewelcor and its officers also have filed a counterclaim similar to the separate action Jewelcor filed against the Lafayette directors. Jewelcor's counterclaim and its separate action against the Lafayette directors are brought pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, to enjoin, *inter alia*, alleged violations of §§ 9(a), 13(d), and 14(a) of that Act, 15 U.S.C. §§ 78i(a), 78m(d), and 78n(a), and the rules and regulations of the SEC promulgated thereunder, in connection with the Lafayette directors' purported conspiracy to prevent a takeover of Lafayette by Jewelcor. Specifically, Jewelcor seeks to enjoin preliminarily the Lafayette directors from: (a) purchasing stock of Lafayette until the "group" purportedly formed by defendants files a Schedule 13D with the SEC and the American Stock Exchange ("Amex"); (b) voting any proxies obtained by them based on Lafayette's allegedly false and misleading proxy materials at Lafayette's adjourned annual shareholders meeting and making a tender offer for Lafayette stock; and (c) continuing to allegedly manipulate the price of Lafayette stock. Jewelcor further seeks an order overturning the vote of Lafayette's shareholders at the November 21, 1974 annual meeting (the nonadjourned part) on the ground that such vote allegedly was obtained as a result of false and misleading proxy materials.

The Lafayette directors oppose this motion, and have brought a motion to dismiss five of the seven causes of action in the Jewelcor amended complaint pursuant to Rule 12(b)(6), F.R.Civ.P.

These actions and the four pending motions come before us some four months after Lafayette filed its original com-

plaint on December 17, 1974, and less than two months after Jewelcor commenced its counter action on February 1, 1974. During that period of time, extensive discovery has been had by both sides, involving more than 40 depositions in at least eight cities, of the principal officers and directors of Lafayette and Jewelcor, and others; and scores of documents have been produced by both sides. Jewelcor's counter action against the Lafayette directors was filed as a result of information obtained during this discovery. Additionally, believing that continued violations of the federal securities laws were taking place, Jewelcor brought on by order to show cause a motion for a temporary restraining order ("TRO") to enjoin preliminarily the Lafayette directors and those in active concert or participation with them from purchasing additional shares of Lafayette stock as part of their alleged plan to prevent a takeover of Lafayette by Jewelcor, and conducting the adjourned annual meeting of Lafayette shareholders, then scheduled for March 25. This Court issued a TRO on March 24th enjoining further purchases of Lafayette stock by the Lafayette directors (and at the same time prohibited purchases of Lafayette stock by Jewelcor and its officers and directors). This Court did not grant temporary injunctive relief with respect to the adjourned annual meeting of Lafayette, however, since counsel for Lafayette represented to this Court that the meeting would be adjourned until April 22. Awaiting a determination from this Court of the motions pending before it, counsel for Lafayette agreed to further adjourn the stockholders meeting until April 29.

## Factual Background

Lafayette is a New York corporation with its principal place of business in Syosset, New York. It is engaged in selling electronic equipment by mail order catalogue, at wholesale and at retail prices, through more than 100 company-owned stores and approximately 375 associate (franchise) stores located throughout the country. Lafayette has in excess of 2,300,000 shares of common stock outstanding, which are listed and traded on the Amex and are held by approximately 2,800 record shareholders and by approximately 6,000 beneficial shareholders. The common stock of Lafayette has been traded at prices ranging from $3.00 to $5.50 per share during the period discussed herein.

Jewelcor is a Pennsylvania corporation whose three principal lines of business are: (1) the sale of jewelry and general merchandise, including merchandise sold by Lafayette, at catalogue showrooms, (2) the distribution of popular-priced name brand watches and the manufacture and sale of precious jewelry; and (3) high-speed commercial printing, including the printing of catalogues.

As of September 30, 1974, Jewelcor had more than 2,800,000 shares of common stock outstanding, held by approximately 2,800 record shareholders. Jewelcor's shares are listed and traded on the New York Stock Exchange.

Between May 31, 1974 and August 30, 1974, Jewelcor accumulated approximately six percent of Lafayette's outstanding stock in some 70 separate transactions. On the latter date, Jewelcor filed a Schedule 13D statement pursuant to § 13(d)(1) of the Securities Exchange Act of 1934,[1] stating that it had pur-

---

1. This section, 15 U.S.C. § 78m(d)(1), provides in pertinent part:

 Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title, . . . is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the [Securities and Exchange] Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors—

chased 145,300 shares of the common stock of Lafayette at prices ranging from $3.87 to $4.25 per share. The Schedule 13D further stated:

Item 3: "The funds used in making the purchases described in this statement, aggregating approximately $640,000, were derived from the general assets and working capital of Jewelcor;"

and

Item 4: "The Common Stock of Lafayette to which this statement relates was purchased by Jewelcor for the purpose of investment. Although Jewelcor has considered the possibility of a future acquisition of control of the business of Lafayette, whether by means of a tender offer, merger or other business combination, open market purchases, private transactions, or otherwise, Jewelcor has not made any definitive plans to attempt to acquire control of Lafayette, nor has Jewelcor entered into any contracts, arrangements or understandings with Lafayette or its affiliates for this purpose. Moreover, any future decision by Jewelcor to acquire control of La-

fayette by means of cash purchases of shares might also be dependent upon Jewelcor's ability to obtain necessary bank or other financing on terms satisfactory to Jewelcor."

Between August 30 and November 15, Jewelcor filed two amendments to its Schedule 13D statement to reflect additional purchases of Lafayette stock, which had increased its share to approximately 9.8 percent of Lafayette's stock, as noted above.

Jewelcor began purchasing Lafayette stock on May 31 following a meeting at its offices of its president, Seymour Holtzman, and its officers Shendell and Cuscela, and Thomas Unterberg and A. Robert Towbin, partners in Jewelcor's investment banking firm of C. E. Unterberg, Towbin & Co. ("Unterberg, Towbin"). During the May 31, 1974 meeting, a Jewelcor official suggested that Lafayette should not be told that Jewelcor was buying Lafayette stock until after a block had been accumulated (Towbin, 43). To maintain secrecy, Jewelcor immediately proceeded to set up a special numbered brokerage account through which all its Lafayette purchases were made. (Shendell, 114–15).[2]

(A) the background and identity of all persons by whom or on whose behalf the purchases have been or are to be effected; (B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price or proposed purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public; (C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the name and address of each such associate; and (E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the person with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

2. Towbin explained that a numbered account was used "because he didn't want the people at Loeb-Rhodes who have access to all of our records to look at our records and know who we were buying stock for . . . ." (Towbin, 117).

Those present at the meeting also explored the possibility of a relationship between Jewelcor and Lafayette. Holtzman or perhaps someone else suggested that Jewelcor buy some Lafayette stock to induce Lafayette to meet with Jewelcor to discuss a merger (Unterberg 36–37, 39).

On June 26, 1974, Holtzman reported to Jewelcor's board of directors that 25,000 shares of Lafayette stock had been acquired and that Jewelcor management was "considering the possibility of a 'friendly' tender offer for a controlling interest in Lafayette [stock]." [3] (Jewelcor Brief in Opposition to Preliminary Injunction, at 16). The board of directors then passed a resolution permitting the purchase of additional Lafayette stock, providing that such purchases not exceed $600,000 or 100,000 shares, whichever first occurred.

The next day, Towbin decided to prepare a financial report on Lafayette after a meeting with Lafayette's president, Leonard Pearlman. A copy of this report, dated July 25, 1974, was sent to Jewelcor shortly thereafter. The report noted that profitability and earnings per share had declined since the previous year, but, on an optimistic note, stated that Lafayette is a "strongly financed" company with products which enjoy a "high quality" image. (Holtzman Ex. 5, at 2).

A majority of the Jewelcor board of directors participated in a conference call on August 5, 1974, during which the board informally approved the purchase of a block of Lafayette stock in excess of the amount previously authorized by the Jewelcor board of directors on June 26, subject to subsequent formal ratification. The purchase of this block would have increased Jewelcor's holdings of Lafayette to more than five percent of outstanding shares, thus necessitating the filing of a Schedule 13D. The participants later discussed that the purchase of this stock "would be a good investment and would enhance the value of the overall block of stock of Lafayette Radio and it would place the company in a strong position in its discussion with Mr. Pearlman." (Cuscela, 26). About a week later, on August 13, Towbin and Unterberg lunched with Pearlman to discuss Jewelcor's possible interest in a merger with Lafayette, at Holtzman's request. This was the first time that Pearlman became aware that Jewelcor had been buying Lafayette stock. (Pearlman, 151). This meeting is described in the minutes of Jewelcor's board of directors' meeting of August 26, on the basis of Unterberg's report to the Jewelcor directors. According to the minutes:

Mr. Unterberg reported that approximately two weeks ago he and his partner, Mr. Robert Towbin, met with Mr. Leonard Perlman [sic], president of Lafayette Radio, and informed the latter that the Company had made market purchases of the stock of Lafayette Radio, that perhaps a friendly tender or merger between [the] Company and Lafayette Radio could be explored and that, in any event, based upon the

---

3. Lafayette maintains that Jewelcor had acquired 31,800 shares of Lafayette stock by this date (Lafayette Brief in Support of Preliminary Injunction, at 18), but the difference is not important. Jewelcor's minutes of the June 26 meeting state that:
Holtzman proceeded to review and explain management's tentative plan. Specifically, Jewelcor would acquire through open market purchases a number of shares of Lafayette's voting common stock as would approximate but be less than 5% of the outstanding holdings. Thereafter, a meeting would be arranged with Lafayette's management to determine whether or not an amicable tender could be accomplished. If it could, Jewelcor would proceed to develop a specific proposal with specific financing aimed at accomplishing the acquisition of control. If a friendly tender was not possible, Jewelcor would proceed to liquidate its holdings through normal market sales. (Holtzman, Ex. 2).
A "friendly" tender offer is one which would be agreeable to Lafayette and in the latter's best interest. A "hostile" tender, by contrast, would be opposed since it allegedly would not be in the target's best interests.

Company's stock ownership in Lafayette Radio, he, Mr. Perlman [sic] ought to meet with the principals of the Company. Mr. Unterberg further reported that Mr. Perlman [sic] did not think such a meeting was timely but indicated that he would be in contact with Mr. Holtzman within the week . . .. (Holtzman Ex. 3, at 1).

The minutes also indicate that Holtzman then contacted Pearlman and set up a meeting for September 15. According to the minutes, Holtzman stated that "at least until his meeting with Mr. Perlman [sic], management could not recommend that the Board definitely determine whether or not to seek control of Lafayette Radio." (*Id.* at 2).

At the August 26th board meeting, the directors approved a resolution authorizing the purchase of up to 9.8 percent Lafayette stock provided that no more than an additional $300,000 be expended. The board also resolved that pending further resolution, "no definitive acts be undertaken whereby the Company seeks control of Lafayette Radio Electronics Corporation."

Four days after the meeting, Jewelcor filed its Schedule 13D statement with the SEC and sent a copy to Lafayette.

On September 3, 1974, Pearlman met with his attorneys Arthur Borden and John Ball, and with Towbin and Unterberg. Towbin stressed to Pearlman that Jewelcor was not considering an "unfriendly" action against Lafayette (Towbin, 80), and that he and Unterberg did not think Jewelcor had the funds to undertake any "unfriendly" action. Towbin explained that Jewelcor had bought Lafayette stock to encourage Lafayette's management to meet with Jewelcor to discuss the possibility of some form of

business combination between them. (Towbin, 80).[4]

Holtzman and Towbin met with Pearlman on September 25, 1974, since the original September 15 date had been postponed. Holtzman described Jewelcor to Pearlman with an eye to persuading him that some form of "friendly" business combination would be mutually beneficial. (Towbin, 92; Misc., Doc. 15). Pearlman replied that he was disturbed by Jewelcor's purchases of Lafayette stock and asked Holtzman not to purchase any more Lafayette stock. Holtzman responded that he would have to consult his board of directors, but that he anticipated that Jewelcor would make further purchases of Lafayette stock to increase its investment, since he felt the stock was undervalued. (Towbin, 92; Holtzman, 104).

On or about October 22, Jewelcor inquired about bidding for the stock held by Lafayette's largest shareholder, the Estate of Abraham Pletman,[5] by sending letters to the estate's executors, Borden, Ball, and the Chase Manhattan Bank. The estate owned shares constituting some 14 percent of the outstanding Lafayette stock. Shortly after these letters were sent, Pearlman expressed his apprehensions about Jewelcor's actions in conversation with Unterberg, stating that Jewelcor was "certainly not acting in a friendly manner." (Jewelcor Brief in Opposition to Preliminary Injunction, at 36).

Meanwhile, between October 16 and 24, Pearlman, Curwin and Ball met with representatives of Marine Midland Bank, First National City Bank and Goldman, Sachs & Co., the investment banking firm, to plan defensive strategy in the event of a tender offer.

---

4. Ball wrote in a memorandum following the meeting that Unterberg and Towbin had explained that "management had no intention of making a tender offer or seeking control of Lafayette. They said that the Lafayette stock had been purchased as investment and as a base for holding discussions with Len

Pearlman to see if there could not be a possibility of the two companies doing something together."

5. Pletman was Pearlman's former father-in-law and founder of Lafayette.

On October 23, Lafayette mailed to its shareholders proxy solicitations for its annual meeting scheduled for November 21, 1974. Shareholders were asked to approve three proposals: (1) an amendment to Lafayette's certificate of incorporation increasing its board of directors to nine, creating three classes of directors to serve for staggered three-year terms, and providing for removal of directors only for cause; (2) an amendment to the certificate of incorporation increasing the shareholder vote required for alteration, change or repeal of the amendments in the first proposal from a majority to two thirds (approval of this proposal itself required a two thirds vote), and (3) the election of four directors.

The October 23 proxy materials, challenged by Jewelcor as false and misleading, stated *inter alia*, that: "To the best of the Company's knowledge, no other company is presently attempting to acquire control of the company." They also stated that the purpose of the proposed amendments was to:

> moderate the pace of any change in control of the Company, and better enable the Board of Directors to protect the interests of remaining shareholders in the event that another company should seek to acquire a controlling stock interest in the company.

The annual shareholders meeting was held as scheduled on November 21, at which time the first proposal was adopted, despite Jewelcor's opposition, and a nine-person board of directors was elected. The second proposal, requiring a two thirds vote for approval, did not come to a vote, since supporting proxies had only been received from the holders of 61 percent of Lafayette's outstanding shares. Jewelcor would have voted against this proposal. Lafayette thus adjourned the meeting until December 26, believing that it might be approved at a later date, since the holders of only 77 percent of the outstanding shares of Lafayette had returned proxies on the second proposal by November 21.[6] (Misc. Doc. 17).

To solicit additional proxies in support of the second proposal, Lafayette sent a letter to its shareholders on November 27. The letter stated that "61% of your company's shares have voted FOR adoption of Proposal 2," although no vote had actually been taken. However, the letter also informed the Lafayette shareholders that approval of Proposal No. 2 required affirmative votes of 66⅔ percent of the outstanding stock of Lafayette.

In anticipation of the adjourned meeting, Jewelcor began soliciting proxies in opposition to Proposal No. 2 on December 6th, after obtaining clearance for its materials from the SEC. Jewelcor's proxy materials echoed its Schedule 13D statement, indicating that it had bought Lafayette stock for investment purposes. Jewelcor's proxy materials also informed shareholders that the funds for its purchases of Lafayette stock had come from cash generated from operations and that "no special borrowings" had been employed. (Holtzman Ex. 24, at 3; Complaint, Ex. D). On December 6th, Lafayette also sent out its own proxy materials in support of Proposal No. 2, informing its shareholders that Jewelcor "is now attempting to defeat the adoption of Proposal 2."

Additionally, Jewelcor began making oral solicitations of proxies through Georgeson & Co., a proxy-solicitation firm. In at least one telephone conversation conducted by Georgeson, the solicitor informed a Lafayette shareholder that Proposal No. 2 had been defeated on November 21, but that Lafayette's management had scheduled another meeting for December 26 for a second vote on this proposal. The solicitor on that occasion also indicated that the majority had voted against Proposal No. 2. It is

---

6. No vote was taken on the second proposal in December and the annual meeting again was adjourned several times, most recently until April 29.

not clear to what extent other solicitors similarly informed Lafayette shareholders.[7]

Eleven days after the December 6 proxy materials were mailed by both Jewelcor and Lafayette, Lafayette commenced its action against Jewelcor, and sought expedited discovery that same day. This Court originally allowed expedited discovery, but agreed to a modified discovery schedule the next day after Lafayette had offered to postpone the shareholders meeting.[8]

Lafayette sent out another letter to its shareholders on February 10, informing them of its belief that Jewelcor "may be attempting to acquire control." Shortly thereafter, the February 18 meeting was again adjourned, this time to March 25.

During December, January and February, meanwhile, Pearlman had purchased 39,900 shares of Lafayette stock, bringing his ownership of Lafayette stock to more than five percent. Consequently, on March 2, he filed a Schedule 13D with the SEC. According to the Schedule 13D:

> The pendency of what Mr. Pearlman believes may be an attempt by Jewelcor to acquire control of the Issuer coupled with the current price of the Issuer's stock influenced Mr. Pearlman in purchasing the shares acquired in December, January, and February at those times. Mr. Pearlman also believes that his purchases in December, 1974, January and February, 1975 were desirable in order to insure continuity and stability in leadership and policy for the Issuer. Mr. Pearlman's purchases will have the effect of making a change in the majority of the Board of Directors more difficult and will better enable him to protect the interests of the Issuer's shareholders in the event that Jewelcor or any other

person or company should seek to acquire control of the Issuer . . .

Pearlman further indicated in his Schedule 13D statement that he might buy additional shares of Lafayette stock in the future, depending on market prices and his financial resources.

Since March 2, Pearlman has not bought further shares of Lafayette stock, and since March 24, he, Lafayette's officers and directors and Jewelcor's officers and directors, have been enjoined from doing so.

*The Summary Judgment Motion*

Jewelcor has moved for summary judgment in Lafayette's action against Jewelcor, contending that there are no genuine issues of material fact, and that it is entitled to summary judgment as a matter of law, since its Schedule 13D and its proxy statements are not false and misleading.

Section 13(d) of the Exchange Act, commonly known as the Williams Act, requires disclosure of certain information by persons acquiring five percent or more of the shares of a registered company in order to alert investors in such companies of relatively sudden accumulations of securities by any person or group, and to apprise investors of potential and actual changes in the conduct of the business or structure of ownership.[9] *See* GAF Corp. v. Milstein, 453 F.2d 709, 717, 720 (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). Regulation 13D consists of a series of specific rules promulgated by the SEC to implement the statute, and requires the filing of a Schedule 13D statement including information concerning the identity and background of the person filing the statement, the source and amount of funds used to purchase the security, and

---

7. See discussion, *infra* at 27–28.

8. Following the December 18th conference before this Court, Lafayette postponed the adjourned annual shareholders meeting from December 26 to February 18, 1975.

9. Part of § 13(d)(1) is quoted at note 1, *supra.*

the reasons for the purchase of the security.

Lafayette alleges in its complaint that Jewelcor's Schedule 13D statement is inaccurate because it misstates Jewelcor's reasons for buying Lafayette stock, and because it misstates Jewelcor's source of funds in its stock purchases. Lafayette further alleges that similar information contained in Jewelcor's proxy solicitation materials is also false and misleading in violation of Section 14(a) of the Exchange Act.

Jewelcor argues in support of its motion for summary judgment that its Schedule 13D has accurately stated its purpose for acquiring Lafayette stock as "investment." Lafayette contends, however, that Jewelcor's initial purchases of Lafayette stock were for the principal purpose of strengthening Jewelcor's position in discussing a merger or other business combination with Lafayette's management.

Jewelcor disputes this contention, asserting that the record clearly demonstrates that it never bought Lafayette stock to strengthen its position with a view towards a business combination with Lafayette. In support of its position, Jewelcor cites its Schedule 13D statement which stated: "Although Jewelcor has considered the possibility of a future acquisition of control of the business of Lafayette, whether by means of a tender offer, merger or other business combination, open market purchases, private transactions or otherwise, Jewelcor has not made any definitive plans to attempt to acquire control of Lafayette . . . ." Jewelcor also notes that the minutes of its board of directors meeting of August 26, 1974 reflect that its president, Seymour Holtzman, "could not recommend that the board definitively determine whether or not to seek control of Lafayette Radio," at least until after he had met with Pearlman. (Block Aff., Ex. C). Similarly, on August 26, the Jewelcor directors resolved that beyond acquiring a specified additional amount of stock, "that no defini-

tive acts be undertaken whereby the Company seeks control of Lafayette Radio Electronics Corporation." Finally, Jewelcor's president has stated categorically in an affidavit in connection with this motion that "Jewelcor has never made a decision to seek control of Lafayette. In fact, Jewelcor has never drafted any papers, sought financing or taken any other steps to prepare to seek to obtain control of Lafayette." (Holtzman Aff., at 8).

Lafayette claims that these facts fail to indicate Jewelcor's real purpose in buying Lafayette stock. Lafayette stresses that Jewelcor's board minutes of June 26, 1974 evince a management plan to form a business combination with Lafayette. Those minutes describe as part of "management's tentative plan" that "a meeting would be arranged to determine whether or not an amicable tender could be accomplished. If it could, Jewelcor would proceed to develop a specific proposal with specific financing aimed at accomplishing the acquistion of control." Those minutes also state that if a friendly tender were not possible, then Jewelcor would liquidate its holdings in Lafayette. Lafayette argues that this statement is convincing evidence that Jewelcor's purpose was not investment but developing a business combination with Lafayette. Lafayette also maintains that Jewelcor's purpose was described accurately by Jewelcor's general counsel Eugene Roth when he recalled that Unterberg had said at the August 26 Jewelcor directors' meeting that one purpose for further investment in Lafayette stock was that "it would give us a greater standing in meeting with Mr. Pearlman . . . ," Lafayette's president. (Roth Dep. 31–32). This statement clearly shows that Jewelcor was investing in Lafayette so that it would be in a strong position to discuss a business combination, Lafayette contends.

Additionally, Lafayette maintains that Jewelcor's purposes were clearly evidenced in August, 1974, when Jewelcor's president, Seymour Holtzman, asked Towbin

to arrange a meeting with Pearlman to discuss Jewelcor's *possible* interest in a merger. Shortly thereafter, Towbin and Unterberg met with Pearlman and informed him that Jewelcor would like to meet with Lafayette to discuss a possible business combination and that such a meeting might make sense, inasmuch as Jewelcor was a large stockholder in Lafayette.

Similarly, Lafayette challenges the accuracy of Jewelcor's citations from the minutes of its August 26 directors' meeting. Lafayette points to a passage that indicates that the Jewelcor board approved additional purchases of Lafayette stock because they "would place [Jewelcor] in a stronger position in its discussions with Mr. Perlman [sic]." (Holtzman Aff. ¶ 6).

■ We conclude on the basis of this evidence that there is a genuine factual issue as to whether Jewelcor's Schedule 13D statement misstated Jewelcor's investment purposes. We find that there is credible evidence tending to show that Jewelcor adequately described its interests in a possible business combination with Lafayette, and that there is also credible evidence tending to show the contrary. We thus deny Jewelcor's motion for summary judgment on this point.

Jewelcor also moves for summary judgment on the ground that its Schedule 13D was completely accurate in stating that the source of its funds for purchasing Lafayette stock was "general assets and working capital." Jewelcor concedes, as it must, that it had extensive borrowings during 1974. However, it denies that the Lafayette stock was purchased with funds obtained from bank loans. (Holtzman Aff. ¶ 20). Instead, it maintains that the Lafayette stock was purchased from general funds derived from all of Jewelcor's operations, which produced cash receipts of $81 million and a net profit exceeding $4 million in the fiscal year ending January, 1974.

Lafayette has more than adequately responded to these assertions. It points out that it is the fiscal year ending January 31, 1975, which is relevant here, and that during that fiscal year substantially all of Jewelcor's net operating profits were wiped out in connection with another business venture. Lafayette also argues that available cash, not receipts, must be used to purchase stock, and that if Jewelcor had not borrowed any funds, it would not have been able to purchase any stock. We find that Lafayette's evidence on this point is sufficient to defeat Jewelcor's motion for summary judgment on this point.

■ Jewelcor next moves for summary judgment on the ground that its Schedule 13D was not misleading in failing to disclose that it had obtained confidential information regarding Lafayette from Unterberg, Towbin, the investment banking firm. Although Unterberg, Towbin had earlier performed services for Lafayette (Towbin, 7), since 1968 there has been no business relationship between them, according to Lafayette's own president. (Pearlman, 92). The only information since 1968 which Jewelcor received from Unterberg, Towbin concerning Lafayette was a report prepared for Unterberg, Towbin's brokerage customers last summer. This report was based solely on public information. These facts are not disputed by Lafayette. We thus find that Jewelcor's Schedule 13D was not misleading in this regard, and grant summary judgment for it on this point. Moreover, we find that Schedule 13D does not require the disclosure of such information in any event.

■ Jewelcor also seeks summary judgment on the ground that its Schedule 13D was not misleading in failing to disclose purported merger discussions between Holtzman and Pearlman, and that Lafayette had rejected any possibility of a merger. We grant summary judgment for Jewelcor on this point, since nowhere is it required in Schedule 13D that a purchaser of securities re-

port on any merger discussions. Moreover, any specific interest of the purchaser in merger presumably would be reported under Item Four of Schedule 13D, requiring a statement of the reasons for the purchase of securities.

Jewelcor additionally moves for summary judgment on the ground that its Schedule 13D was not false in failing to state that Jewelcor definitely would purchase additional shares of Lafayette stock. Jewelcor contends that it never had any definite plans to acquire additional shares of Lafayette, and, moreover, that any purchase by it of Lafayette stock after it filed its Schedule 13D was dependent on market conditions. (Holtzman Aff., ¶ 17). While Lafayette has vigorously disputed Jewelcor's assertions regarding the purposes of its purchases, it has not presented any evidence demonstrating that Jewelcor had a definite intent to purchase additional shares of Lafayette stock after it filed its Schedule 13D statement. Accordingly, we grant summary judgment for Jewelcor on this point.

■ Jewelcor next seeks summary judgment on the ground that its Schedule 13D was not faulty for failing to disclose

that its stock was held in a nominee name in a custody account at the First National Bank of Chicago. Jewelcor concedes that its stock was held in a nominee name but maintains that this is a common practice among financial institutions to more efficiently handle custody accounts. (Kamerlander, 11–12). We grant summary judgment for Jewelcor on this point, since we find as a matter of law that this information was not required under either Items five or six of Schedule 13D.[10]

■ Section 14(a) of the 1934 Act[11] requires full and accurate disclosure of all material facts in any proxy solicitation materials. Lafayette alleges in its complaint that Jewelcor violated this section when it solicited proxies last December in opposition to Proposal No. 2, an amendment to Lafayette's certificate of incorporation scheduled to be voted on at the adjourned shareholders meeting.

Jewelcor now moves for summary judgment on the ground that none of the information in its proxy materials (Holtzman Ex. 24) was false or misleading. Much of the material in these proxy materials is similar to the information in Jewelcor's Schedule 13D.

10. Schedule 13D, Item 5 declares: State the number of shares of the security which are beneficially owned, and the number of shares concerning which there is a right to acquire directly or indirectly, by (i) such persons, and (ii) each associate of such person, giving the name and address of each such associate. Furnish information as to all transactions in the class of securities to which this statement relates which were effected during the past 60 days by the person filing this statement and by its subsidiaries and their officers, directors and affiliated persons.

Item 6 states: Furnish information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

Item 5 does not require such information, since there is no contention that Jewelcor did not beneficially own the stock in question. Similarly, Item 6 does not require this information, since holding stock in a nominee name was merely an administrative scheme which did not materially affect Jewelcor's ownership of the stock.

11. Section 14(a), 15 U.S.C. § 78n(a) states: It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

Thus, the proxy materials echo the Schedule 13D language in stating that Jewelcor bought its Lafayette shares for purposes of investment. Since we found that there is a genuine issue of fact as to whether that assertion was accurate, we also must find that there is a genuine issue of fact as to whether that statement of Jewelcor's purpose was false and misleading in violation of § 14(a) and the SEC rules and regulations promulgated thereunder. Accordingly, we deny Jewelcor's summary judgment motion on this point.

Jewelcor's proxy statement stated that the funds used to purchase Lafayette stock came from cash generated from operations and that no "special borrowings" were utilized. We have found that Jewelcor's Schedule 13D with respect to its source of funds presents a genuine issue of fact; we also find that Jewelcor's proxy statement presents a genuine issue of fact here, since there is conflicting evidence as to whether that statement is misleading.

Jewelcor additionally seeks summary judgment on three points that are alleged in Lafayette's complaint and relate only to proxy materials. First, Jewelcor seeks summary judgment on the ground that its proxy materials were not false or misleading in failing to state that Jewelcor had formulated a plan to take control of Lafayette. This point is closely connected to the issue discussed above regarding Jewelcor's purpose in buying Lafayette stock. Since we have denied summary judgment on that issue, we must deny it here. Second, Jewelcor asks for summary judgment on the ground that its proxy materials were not false or misleading in failing to state that Jewelcor would have supported the second proposal at the Lafayette shareholders meeting if it had been offered a position on Lafayette's board of directors. Jewelcor supports this point by a declaration of its president that Jewelcor never had any interest in a Lafayette directorship and by an admission by Lafayette's president that no one at

Jewelcor ever requested a seat on Lafayette's board of directors. (Pearlman, 197). Lafayette does not dispute this evidence. Consequently, we hold that Jewelcor is entitled to summary judgment on this item. Third, Jewelcor requests summary judgment on the ground that it did not wrongfully fail to disclose that its Lafayette stock was held in a custody account in a nominee name. Lafayette argues that such disclosure was required pursuant to Item 5(f) of Schedule 14A, which calls for disclosure of "any contractual arrangements . . . the operation of the terms of which may at a subsequent date result in a change in control of the issuer." Since Jewelcor's custody arrangement could not result in a change in control of the issuer, this section is inapplicable, and Jewelcor is entitled to prevail here on its summary judgment motion.

The final issue on this summary judgment motion is whether the oral proxy solicitations conducted by a proxy soliciting firm on behalf of Jewelcor were false and misleading. As indicated above, at least one proxy solicitor stated to a Lafayette shareholder that Proposal No. 2 had been defeated by a majority of Lafayette's shareholders. In fact, no vote had been taken on Proposal No. 2, and a majority of Lafayette's proxies supported it. Thus, it is hard to understand how Jewelcor could expect to prevail on a summary judgment motion on this point. At the very least, the available evidence suggests rather strongly that at least some of the oral solicitations were false if not misleading. Accordingly, we deny Jewelcor's motion with respect to this item.

*Lafayette's Preliminary Injunction Motion*

The standard to be applied in determining whether a preliminary injunction should be granted is:

a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litiga-

tion *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

Sonesta International Hotels Corp. v. Wellington Assoc., 483 F.2d 247, 250 (2d Cir. 1973). *But see* Sampson v. Murray, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed. 2d 166 (1974). Since we find, for the reasons discussed below, that plaintiff Lafayette has failed to meet either standard, its motion for preliminary injunctive relief is denied.

On this motion, Lafayette seeks to enjoin Jewelcor from acquiring additional shares of Lafayette stock, voting its Lafayette stock except in favor of Proposal No. 2 at the adjourned shareholders meeting, and soliciting proxies or consents from shareholders in opposition to Proposal No. 2. The issues here are basically the same as on the summary judgment motion—*viz.* whether Jewelcor's Schedule 13D is accurate and whether its proxy materials were false and misleading in violation of § 14(a) of the Exchange Act.

*Alleged Violations of Schedule 13D*

■ Item 4 of Schedule 13D requires purchasers of more than five percent of the securities of a company to:

> [s]tate the purpose or purposes of the purchase or proposed purchase of securities of the issuer. If the purpose or one of the purposes of the purchase or proposed purchase is to acquire control of the business of the issuer, describe any plans or proposals which the purchasers may have to liquidate the issuer, to sell its assets or to merge it with any other persons, or to make any other major change in its business or corporate structure . . . ..

Lafayette's primary contention is that while this item of Schedule 13D calls for disclosure of the purchaser's plans and purposes, Jewelcor has failed to describe accurately its purposes. Jewelcor's purposes, according to Lafayette, were investment *and* strengthening its position in anticipation of discussions regarding a business combination with Lafayette. According to Lafayette, Jewelcor's Schedule 13D was inaccurate since it stated that it was buying Lafayette stock "for purposes of investment." Jewelcor contends that its Schedule 13D must be viewed as a whole, without isolating its statement that it bought Lafayette stock for investment purposes. We agree with Jewelcor. It seems to us that Lafayette is making too much of the distinction between plans and purposes, especially since both subjects must be discussed in the same item of Schedule 13D. Schedule 13D requires a statement of the plans of the purchaser if and only if one of the purposes of the purchase is "to acquire control of the business of the issuer." Thus, Jewelcor's statement that it had considered possible business combinations with Lafayette necessarily implied that one of the reasons it had bought Lafayette stock was the formation of some kind of business combination with Lafayette. Whether its statement was accurate in this context must be considered in light of the purposes of disclosure under § 13(d). The Second Circuit has noted that:

> section 13(d) was intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing. Disclosure which is false or misleading subverts this purpose.

GAF Corporation v. Milstein, 453 F.2d 709, 720 (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). *See also* Comm. for New Management of Butler Aviation v. Widmark, 335 F.Supp. 146, 154 (E.D.N.Y.1971); Comment, Section 13(d) and Disclosure of Corporate Equity Ownership, 119 U. Pa.L.Rev. 853, 854 (1971). The basic question, then, is whether the information in Jewelcor's Schedule 13D would fairly apprise investors of potential changes in Lafayette's corporate control. We are inclined to believe that it does, although we realize there is contrary evi-

dence.[12] There can be little doubt that Lafayette's shareholders were adequately informed about possible courses of action Jewelcor had considered and its purpose or purposes in purchasing Lafayette stock.

Moreover, Jewelcor might well have been guilty of violating § 13(d) had it specifically stated that one of its purposes for purchasing Lafayette stock was furthering Jewelcor's interest in merging with Lafayette, if such option were in fact only a possibility. In this context, we find controlling the following language of the Second Circuit in discussing the "plans or proposals" language of Item 4:

> The person or corporation filing a Schedule 13D statement need not necessarily walk a tortuous path. He must, of course, be precise and forthright in making full and fair disclosure as to all material facts called for by the various items of the schedule. At the same time he must be careful not to delineate extravagantly or to enlarge beyond reasonable bounds. The securities market is delicately arranged and needs only slight impetus to upset it. As Judge Friendly has pointed out . . . ., "It would be as serious an infringement of these [SEC] regulations to overstate the definiteness of the plans as to understate them." Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2d Cir. 1969).

\* \* \*

Though the offeror has an obligation fairly to disclose its plans in the event of a takeover, it is not required to make predictions of future behavior, however tentatively phrased, which may cause the offeree or the public investor to rely on them unjustifiably . . . . Target companies must not be provided the opportunity to use the future plans provision as a tool for dilatory litigation.

Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d 1075, 1085–86 (2d Cir. 1970).

Lafayette argues that Gulf & Western Indus. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687 (2d Cir. 1973), supports the proposition that Item 4 of Jewelcor's Schedule 13D statement is inaccurate. We believe Lafayette's reliance on this case is misplaced. In Gulf & Western, the court found that Gulf & Western's Schedule 13D violated § 14(e) of the Securities and Exchange Act of 1934 in stating that it had bought A&P stock for investment purposes and in failing to disclose its intent to acquire a controlling interest in A&P or at least to exercise influence over A&P's management and policies. The court found that "[a]ny of the tendering shareholders who did not tender all of their A&P holdings to G&W would be influenced in their decision whether or not to tender by the fact that G&W would eventually control or substantially influence the operations of A&P." 476 F.2d at 696. The court rested its decision on G&W's "well-established practice" of eventually acquiring firms in which it initially purchased only a small percentage of the outstanding shares, on a finding that G&W's commitment to purchase A&P shares was the largest in its history, and on a finding that A&P stock, according to Gulf & Western's president, did not constitute a good investment. In the instant case, the situation is somewhat different. Although Jewelcor has acquired other firms in the past, it has not made any acquisitions since 1972, and it has never acquired a publicly held corporation. Moreover, while this case is similar to Gulf & Western in that Jewelcor had never previously purchased such a large block of stock in another company, it is different in that there is evidence that Jewelcor did consider its purchases of Lafayette stock a good investment. Finally, as we have already noted, Jewelcor indicated in its Schedule 13D that it was considering different

---

12. See pages 18–22, supra.

forms of business combination with Lafayette, whereas Gulf & Western did not indicate that it intended to acquire a controlling interest in A&P or exercise influence over its management and policies.

Lafayette also places reliance on Loews Corp. v. Accident & Cas. Ins. Co. of Winterthur, 74 Civ. 1396 (N.D.Ill.1974). In *Loews,* the defendant filed a Schedule 13D stating that its purpose for buying stock was investment and to preserve its historic relationship with the insurance subsidiaries of the issuing company. The court found that this statement violated Schedule 13D since it did not disclose that the defendant's primary purpose was to stop, frustrate or discourage a tender offer for shares of the issuer by any company not acceptable to it. Slip Op., at 8. Lafayette argues that just as Winterthur had not disclosed that its purpose was to discourage a tender, Jewelcor has failed to disclose that the purpose of its purchase was to encourage a merger. We believe that *Loews* is distinguishable. In that case, the defendant's president had stated publicly that the defendant's purpose was to discourage a tender. Slip Op., at 5. Here, by contrast, there is no evidence that Jewelcor had announced publicly at any time that it was seeking to encourage a merger. There is some evidence tending to show that Jewelcor was interested in a merger, but there is no evidence as in *Loews* that Jewelcor had stated publicly its unqualified intention in terms conflicting with its Schedule 13D.

On this record, we do not think that Lafayette has demonstrated a probability of success on this issue at a trial on the merits so as to warrant the issuance of a preliminary injunction. Nor do we find "these issues so difficult and doubtful as to tip the balance of hardship toward [Lafayette] and thus warrant the issuance of an injunction . . . ." Gulf & Western Ind. v. Great Atlantic & Pacific Tea Co., 356 F.Supp. 1066, 1072 (S.D.N.Y.), aff'd 476 F.2d 687 (2d Cir. 1973).

Lafayette's next contention is that Jewelcor's Schedule 13D was inaccurate in stating that it purchased Lafayette stock from its "general assets and working capital." Section 13(d)(1)(B) provides that any person who is directly or indirectly the beneficial owner of five percent of any registered security must disclose:

> The source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price or proposed purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto . . .

A similar requirement is contained in Item 3 of Schedule 13D. Lafayette urges that Jewelcor's Schedule 13D was inaccurate because it failed to state that Jewelcor had bought Lafayette stock with funds obtained from bank loans extended to Jewelcor for working capital purposes through existing lines of credit. These omissions are significant, Lafayette argues, because such information might persuade prospective sellers to buy or prospective buyers to sell, depending on the financial picture such information might reveal. Lafayette further argues that Jewelcor's statement is misleading because it suggests that Jewelcor was in a robust financial condition and able to afford nearly $1 million out of its working capital for stock purchases. In fact, Lafayette contends, Jewelcor's financial picture was somewhat bleak. Jewelcor was ostensibly borrowing funds at an all-time high rate, and without these borrowings would have been unable to operate its business, much less purchase almost $1 million of Lafayette stock. Lafayette raises the specter that:

> If Jewelcor's sketchy disclosure of the source of funds is found to be sufficient, henceforth Section 13(d)(1)(B) could be effectively emasculated merely

by arbitrarily labelling all borrowings as having been incurred for nonstock purchases. The prospective stock purchaser would need only apply to a bank for working capital funds, pool the money with general revenues and then declare that it is using other available funds for purchasing the stock.

(Lafayette Brief in Support of Preliminary Injunction Motion, at 91).

Jewelcor vigorously disputes Lafayette's allegations. Jewelcor concedes that a portion of its working capital came from borrowed funds, but maintains that no borrowings were obtained *for the purpose of* acquiring Lafayette securities. According to Jewelcor, Section 13(d) only requires disclosure of borrowings obtained for the specific purpose of purchasing stock, and since its borrowings allegedly do not fall within that category, it was not required to include information about its bank loans in its Schedule 13D. Jewelcor supports this argument by a declaration of its financial vice president that he did not take into consideration Jewelcor's stock purchases when determining how much he would draw on Jewelcor's lines of credit. (Litchman Aff., ¶ 23). Jewelcor also disputes Lafayette's contention that its borrowings enabled it to purchase Lafayette stock. Jewelcor asserts that it could have spent the same amount for stock by reducing its payments for trade payables,[13] and correspondingly reducing its borrowings by an equivalent amount. Without going into a lengthy analysis, we find this argument plausible in light of Jewelcor's statement that it voluntarily increased its payments for trade payables in order to take advantage of substantial discounts offered by its vendors. (Litchman Aff., ¶ 21).

Jewelcor disagrees with Lafayette's contention that nondisclosure of its borrowings for working capital was merely a device to circumvent the disclosure requirements of Section 13(d)(1)(B). On

the contrary, Jewelcor argues, if Lafayette's statutory interpretation is correct, Jewelcor would be required to disclose "any and all borrowings, . . . regardless of the purpose . . ." (Jewelcor Brief in Opposition to Preliminary Injunction Motion, at 80). Such a requirement was not intended by the drafters of the statute, according to Jewelcor, since the statute is concerned about specific loans used to finance tender offers, not general corporate financings. *See generally* Note, The Courts and the Williams Act: Try a Little Tenderness, 48 N.Y.U.L.Rev. 991, 1000 (1973). And, Jewelcor says, it was not deficient in this regard since it specifically stated in its Schedule 13D that "any future decision by Jewelcor to acquire control of Lafayette by means of cash purchases of shares might also depend upon Jewelcor's ability to obtain necessary bank or other financing on terms satisfactory to Jewelcor."

Finally, Jewelcor disagrees with Lafayette's contention that it is a "debt-laden" company in poor financial condition. Rather, it maintains that it is in a very strong financial position, as evidenced by reports from the First National Bank of Chicago, Dun & Bradstreet, and the National Credit Service. (Litchman Aff., ¶¶ 4, 10, Exs. B, D, E). Jewelcor also justifies its increase in short-term debt from $2.3 million in January, 1974 to some $9.8 million in January, 1975 by noting that it did so in exchange for reducing its trade payables by almost an equivalent amount to take advantage of trade discounts by vendors. Jewelcor also points to an absence of funds from public offerings present in previous years, a need for increased inventory due to the opening of additional showrooms, and a desire to take advantage of easily available credit at banks which had served as depositories for Jewelcor's accounts receivable as explanations for its sudden rise in borrowings.

---

13. Trade payables are those amounts which Jewelcor owes to its vendors for the purchase of its inventories.

■ We conclude on the basis of this evidence that plaintiff has demonstrated a likelihood that it will succeed on the merits at trial.[14] We are not persuaded by Jewelcor's explanation that its loans were not necessary for its purchase of Lafayette stock. We find it likely that Lafayette will be able to show at a trial on the merits that Jewelcor was not in relatively good financial condition in 1974 and that at least some of its borrowings were for the purpose of acquiring Lafayette stock. However, we do not find that the balance of hardships in denying injunctive relief here is such that Lafayette will be unduly harmed by a denial of injunctive relief. This is not a tender offer or a merger where the denial of a preliminary injunction will make it difficult to "unscramble the eggs" if relief is finally given to the party seeking the injunction. Sonesta Int'l Hotels Corp. v. Wellington Assoc., *supra*, 483 F.2d at 250 (citations omitted). Rather, the denial of injunctive relief here will only mean that Jewelcor would be able to vote its shares and proxies against Proposal No. 2, which does not fundamentally affect the nature of Jewelcor's business operations or management. In addition, while the denial of injunctive relief will permit Jewelcor to purchase further shares of Lafayette, when and if Jewelcor does decide to make a tender offer or does plan a merger, such future purchases will not immediately affect Lafayette, since Jewelcor will be obligated to disclose any changed intentions in a subsequent Schedule 13D.

*Alleged Violations of Section 14(a)*

■ Lafayette also seeks preliminary injunctive relief on the ground that Jewelcor's proxy statement in opposition to Proposal No. 2 is false and misleading in violation of § 14(a) of the 1934 Act for essentially the same reasons it claims that Jewelcor's Schedule 13D is inaccurate.

Under Rule 14a–9 of the 1934 Act:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statement therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

The Second Circuit has described the test for determining the materiality of a fact as "whether, taking a properly realistic view, there is a substantial likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course." General Time Corp. v. Talley Indus., Inc., 403 F.2d 159, 162 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969). *See also* Gerstle v. Gamble-Skogmo, 478 F.2d 1281, 1301–02 (2d Cir. 1973).

■ With these standards in mind, we find that there is insufficient evidence to conclude that Jewelcor's proxy statement misstates Jewelcor's purpose in purchasing Lafayette securities. Since the language in Jewelcor's proxy materials is almost identical to the language in its Schedule 13D, the reasons we expressed for denying Lafayette's motion for a preliminary injunction apply equally here. In addition, we conclude that it will be difficult for Lafay-

---

14. Because our finding turns on the facts of this case, we need not decide whether § 13(d)(1)(B) requires disclosure of all corporate borrowings including those not specifically for purchase of stock. For an opinion that such disclosure is required, *see*, Griffin and Tucker, The Williams Act, Public Law 90–439—Growing Pains? Some Interpretations with Respect to the Williams Act, 16 Howard L.J. 654, 669–70 (1971).

ette to prevail on the merits on the issue of Jewelcor's purpose for purchasing Lafayette stock since in addition to the information in the Schedule 13D, Jewelcor also stated, "If Lafayette management's 66⅔% note proposal is adopted, one of the effects could be to deter Jewelcor or any other company from attempting to acquire control of Lafayette." This statement does not suggest that Jewelcor was seeking to conceal its motives during the proxy solicitation. However, we find that Lafayette is likely to prevail on the merits at trial regarding alleged misstatements concerning Jewelcor's source of funds. The language in Jewelcor's proxy materials is similar to the language in its Schedule 13D, but also states that it made no "special borrowings" to purchase Lafayette stock. Although this implies that Jewelcor did use some borrowings, we conclude that Lafayette likely will prevail on the merits on this point for the reasons set forth in our discussion of its Schedule 13D.

■ Finally, Lafayette maintains the Jewelcor's oral proxy solicitations were materially false and misleading, primarily on the basis of one taped oral solicitation in which a Jewelcor proxy solicitor incorrectly stated that Proposal No. 2 had been defeated and that a majority had voted against it. We believe that this one incident is insufficient to demonstrate a violation of § 14(a), and thus also deny Lafayette's motion for a preliminary injunction on this ground.

*Balancing the Equities*

■ We have thus far expressed our view that Lafayette is likely to prevail on the merits on only some of its contentions. However, we decline to grant Lafayette injunctive relief, since we find that no irreparable injury will occur to Lafayette by a denial of its motion. As we noted above, a denial of its motion may result in the defeat of Proposal No. 2 and the purchasing of additional shares of stock by Jewelcor, neither of which bodes dire consequences for Lafayette, especially in the absence of a specific tender offer or proposed merger. Moreover, in balancing the equities, the hardships do not tip decidedly in favor of Lafayette. A denial of this motion will not have a serious detrimental effect on Lafayette. On the other hand, granting the motion may well cause a hardship to Jewelcor since Lafayette's shareholders may very possibly view the injunction inaccurately as a final determination of wrongdoing on Jewelcor's part, and thus thwart any future legitimate efforts by Jewelcor to form a business combination with Lafayette. *See* Comm. for a New Management of Butler Aviation v. Widmark, 335 F. Supp. 146, 152 (E.D.N.Y.1971); Sherman v. Posner, 266 F.Supp. 871 (S.D.N.Y.1966).

*The Motion to Dismiss*

The Lafayette directors bring this motion to dismiss against Jewelcor pursuant to Rule 12(b)(6), F.R.Civ.P. In its complaint Jewelcor charges the Lafayette directors with violations of §§ 13(d) and 14(a) of the Exchange Act similar to those in Lafayette's action against Jewelcor. Jewelcor also alleges, *inter alia*, that the Lafayette directors unlawfully manipulated the price of Lafayette stock and tortiously interfered with Jewelcor's banking and business relationships. The instant motion seeks to dismiss five of the seven claims of Jewelcor's amended complaint.[15]

In assessing the five claims before us on this motion, we need not reach the merits but must only determine whether Jewelcor might be entitled to relief under any state of facts which could be proved in support of the

---

15. Jewelcor's second and fifth claims are not included in the motion to dismiss. The second claim alleges violations of § 14(a) of the Exchange Act and Rule 14a–9 promulgated thereunder; the fifth claim similarly alleges false and misleading proxy solicitations in violation of § 14(a) of the Exchange Act and Rules 14a–6 and 14a–9 promulgated thereunder.

claim. Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Jewelcor's first claim alleges that defendants, acting with three other individuals, formed a group "for the purpose of perpetuating themselves in office and in opposition to all efforts to limit or restrict defendants' control over Lafayette. . . ." (Complaint, ¶ 14(d)). Jewelcor maintains that this group violated § 13(d)(3) of the Exchange Act in failing to file a Schedule 13D statement. Section 13(d)(3) provides:

> When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

Lafayette's directors contend that this subsection does not apply to management groups, and, thus Jewelcor has failed to state a cause of action. Jewelcor disagrees, arguing that it has alleged in its complaint that the defendants' group included both management and nonmanagement people, and thus comes within the statute. We agree with Jewelcor. The two cases on which Lafayette relies for support of its proposition that management groups need not file Schedule 13D statements both concerned groups consisting only of a company's officers and directors. *See* Corenco Corp. v. Schiavone & Sons, Inc., 488 F.2d 207, 218 (2d Cir. 1973); Scott v. Multi-Amp Corp., 386 F.Supp. 44, 61–63 (D.N.J. 1974). Here, by contrast, the alleged group involves nonmanagement entities such as the Estate of Abraham Pletman, Lafayette's largest stockholder. If a group including Lafayette management and the Pletman estate did in fact exist,

it certainly would have been required to file a Schedule 13D, since § 13(d) disclosure is designed to keep the investing public informed about potential changes in corporate management and control and able to evaluate adequately a company's worth. GAF Corp. v. Milstein, 453 F.2d 709 (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). *See also* Comment Section 13 (d) and Disclosure of Corporate Equity Ownership, 119 U.Pa.L.Rev. 853, 854–55, 876 (1971). Or, as another court has stated, § 13(d) was intended to apply whenever "substantial shareholders *or management* undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed." Bath Indus., Inc. v. Blot, 427 F.2d 97, 109 (7th Cir. 1970) (emphasis supplied).

Moreover, we do not agree with Lafayette that § 13(d) does not apply to management groups. In Corenco Corp. v. Schiavone & Sons, *supra*, the Second Circuit considered whether § 13(d) applies to management groups.[16] In that case, the aggressor company in a tender offer contest argued that the management of the target should have filed a Schedule 13D since its members allegedly constituted a management group formed to oppose the tender offer. The Court rejected this argument, finding that "the members of [the aggressor's] management were not required to file individual Schedule 13D statements when they agreed to pool their interests to fight the threatened takeover." 488 F.2d at 218. However, that conclusion did not amount to a holding that management groups are never required to file Schedule 13D statements, since the court found that § 14(d)(4) of the Exchange Act specifically requires the disclosure of certain information when the management of a company advises its share-

---

16. In GAF Corp. v. Milstein, 453 F.2d 709 (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), an earlier case, the Second Circuit expressly refrained from deciding whether § 13(d) applies to management groups. 453 F.2d at 719, n. 20.

holders to reject a tender offer. *Id.* Here, where there has been no tender offer, we believe that the provisions of § 13(d) should apply to management groups, especially management groups including nonmanagement members. This view has recently been supported by the SEC. *Tony Lama Co.*, CCH Fed.Sec.L.Rep. ¶ 79,901 (1974). *But see* Scott v. Multi-Amp Corp., *supra*, 386 F.Supp. at 61–63 (D.N.J.1974). We thus find that even if the alleged Lafayette directors' group were to consist only of management personnel, that group still would have been required to file a Schedule 13D.

 Lafayette contends that Jewelcor's third claim alleging unlawful price manipulations of Lafayette stock by defendants fails to state a claim under § 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2). That section makes it unlawful:

> to effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of ˄ such security by others.

This section must be read in conjunction with § 9(e), which provides that any person who violates § 9(a):

> shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction.

Lafayette contends that Jewelcor has failed to state a claim under § 9(a), since it has failed to allege that the manipulation was effected for the purpose of inducing the purchase or sale of securities and that it was damaged by the manipulation. Lafayette also asserts that Jewelcor's claim is not stated with sufficient particularity in accordance with the requirements of Rule 9(b), F.R.Civ. P.

We agree with Jewelcor that it has sufficiently stated the reasons for the Lafayette directors' alleged manipulative transactions, since it stated in ¶ 38 of its complaint that those transactions were entered into "for the purpose of inducing the purchase or sale of such stock by others." We reject Jewelcor's assertion, however, that it need not allege it was damaged by the alleged manipulative transactions. Jewelcor maintains the price it paid for Lafayette stock was "obviously" affected by defendants' manipulation, since Jewelcor purchased stock during the period of claimed manipulation. However, Section 9(e) specifically requires an allegation that the price of stock bought or sold was affected by the defendants' manipulation. Rosenberg v. Hano, 121 F.2d 818 (3d Cir. 1941); duPont v. Wyly, 61 F.R.D. 615 (D.Del.1973). Jewelcor argues that these cases are inapposite since they apply to cases involving money damages, whereas in actions seeking only injunctive relief, as here, the rule is otherwise. Mutual Shares Corp. v. Genesco, 384 F.2d 540 (2d Cir. 1967). *See also* SEC v. Everest Management Corp., 475 F.2d 1236, 1240 (2d Cir. 1972). Those latter cases, however, do not appear to involve actions under § 9(a), but, rather, under other antifraud sections of the securities laws which do not contain specific provisions requiring an allegation of damages. Significantly, § 9(e) requires an allegation that defendants' manipulations have affected the price at which plaintiffs have purchased stock in actions at law and in equity. Thus, we find that § 9(e) requires an allegation of damages, even though plaintiff is seeking only injunctive relief.[17] Plaintiff's failure to

---

17. As one court has stated in an action where plaintiff sought damages and injunctive relief:

In light of the express requirement of Section 9(e) that liability be predicated on a purchase or sale at a price affected by the

do so here is fatal to its cause of action on its § 9(a) claim, and we thus grant defendant's motion to dismiss, subject to ten days leave to amend the complaint. Because of this conclusion, we can not reach the question of whether Jewelcor's allegations of fraud on this claim were sufficiently particular to comply with Rule 9(b), F.R.Civ.P.

■ Lafayette moves to dismiss Jewelcor's claim under Rule 10b–5 for its failure to allege essential elements of a cause of action under that rule.[18] Specifically, Lafayette asserts that Jewelcor has failed to allege (1) any acts of manipulation or deception which occurred in connection with Jewelcor's purchases, (2) damages, (3) a causal connection between the damage and the alleged manipulative or deceptive acts, and (4) a concealment of or failure to disclose material facts. Much of the Lafayette directors' arguments on these grounds misses the mark, since they deal with issues of damage and causation. As we have noted, these items need not be specifically pleaded in a claim alleging a violation of 10b–5 seeking only injunctive relief, as here. Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967). In that case, there was a claim for damages and injunctive relief under Rule 10b–5. The court found that the damages claim foundered "both on proof of loss and the causal connection with the alleged violation of the Rule; on the other hand, the claim for injunctive relief largely avoids these issues, may

cure harm suffered by continuing shareholders, and would afford complete relief against the Rule 10b–5 violation for the future." 384 F.2d at 547.

■ Since Jewelcor's claim is legally sufficient in spite of its failure to plead damages and causation, we turn to Lafayette's remaining contention that Jewelcor has failed to plead a concealment of or a failure to disclose material facts. The duty to disclose material facts under Rule 10b–5 is central to the finding of a violation. Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). The *Ute* Court found that "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." 406 U.S. at 153–54, 92 S.Ct. at 1472 (citations omitted). We believe that Jewelcor has adequately alleged a concealment of or failure to disclose material facts. It has alleged market manipulations by the Lafayette directors, and dissemination by the Lafayette directors of false and misleading information to the public regarding Lafayette's financial condition. These alleged acts and omissions, as well as others, if true, could have been material to a reasonable investor. We thus find that Jewelcor has stated a legally sufficient claim under Rule 10b–5 and deny Lafayette's motion on this point.[19]

■ Lafayette also seeks dismissal of two pendent state claims asserted by

allegedly offending conduct, I conclude that plaintiff has not stated a claim upon which relief could be granted under Section 9.
duPont v. Wyly, 61 F.R.D. 615, 630 (D.Del. 1973) (citation omitted).

18. Rule 10b–5 provides in pertinent part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 (1) to employ any device, scheme or artifice to defraud [or]
 (2) to make any untrue statement of a material fact or to omit to state a material

fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security.

19. We also reject Lafayette's claim that Jewelcor's Rule 10b–5 claim was not pleaded with sufficient particularity under Rule 9(b), F.R.Civ.P. *See* duPont v. Wyly, 61 F. R.D. 615, 630–31 (D.Del.1973). We find the allegations in Jewelcor's complaint are alleged with more particularity than those found insufficient by the Second Circuit in Segal v. Gordon, 467 F.2d 602 (2d Cir. 1972).

Jewelcor. Jewelcor's sixth claim alleges that the Lafayette directors "tortiously and maliciously, and for no legitimate business purpose, conspired to interfere with Jewelcor's present and prospective banking relationships." (Complaint, ¶ 48). The Lafayette directors seek to dismiss this claim on the ground that the mere allegation of a conspiracy without the commission of an underlying tort is insufficient to state a civil claim. Assuming that this is true, we find that Jewelcor has not alleged a bare conspiracy, and nothing more. On the contrary, Jewelcor has alleged in its complaint several specific acts of interference by the Lafayette directors with Jewelcor's banking relationships. These allegations, if true, would be sufficient to make out a tort claim for interference with present or prospective advantage or with business relationships. However, the Lafayette directors also allege that Jewelcor's sixth claim must fail because Jewelcor has failed to plead special damages. According to the Lafayette directors, a claim for interference with prospective advantage requires pleading of special damages. The cases they cite, however, do not stand for the asserted proposition. First, neither Rager v. McCloskey, 305 N.Y. 75, 111 N.E.2d 214 (1953) nor Frawley Chemical Corp. v. Larsen Co., 274 App.Div. 643, 86 N.Y.S.2d 710 (1st Dep't 1949) concerned tortious interference with prospective business advantage. Second, both cases involved claims for money damages; here, by contrast, Jewelcor seeks only injunctive relief. And, in similar cases involving claims of unfair competition, it has been held that special damages need not be pleaded where only injunctive relief is sought. Bristol-Meyers Co. v. Picker, 302 N.Y. 61, 70, 96 N.E.2d 177, 181 (1950); Matsushita Electric Corp. v. Jamaica Gas & Electric, 44 A.D.2d 708, 354 N.Y.S.2d 695 (2d Dep't 1974). Thus, we deny the Lafayette directors' motion to dismiss plaintiff's sixth cause of action.

 Jewelcor's seventh cause of action asserts a claim for commission of a prima facie tort. "The key to the prima facie tort," one court has explained, is:

> infliction of intentional harm, resulting in damage, without excuse or justification, by an act or a series of acts which would otherwise be lawful. The need for the doctrine of prima facie tort arises only because the specific acts relied upon—and which it is asserted caused the injury—are not, in the absence of the intention to harm, tortious, unlawful, and therefore, actionable. The remedy is invoked when the intention to harm, as distinguished from the intention merely to commit the act, is present, has motivated the action, and has caused the injury to plaintiff, all without excuse or justification.

Ruza v. Ruza, 286 App.Div. 767, 769, 146 N.Y.S.2d 808, 811 (1st Dep't 1955). *See also* RKO-Stanley Warner Theatres, Inc. v. Century Circuit, Inc., 37 App.Div.2d 828, 325 N.Y.S.2d 270 (1st Dep't 1970). The Lafayette directors urge that Jewelcor has failed to state an actionable claim since its complaint alleges that defendants' conduct was motivated by the business purpose of solidifying their control of Lafayette. We disagree. Jewelcor has alleged both business and non-business motives for defendants' acts. Specifically, Jewelcor contends that the defendants conducted discussions with Jewelcor's banks with no legitimate business purpose and for the sole purpose of endangering Jewelcor's business relationships and discrediting Jewelcor. The complaint also asserts that defendants contacted Jewelcor's banks and, completely without factual basis, stated to them that Jewelcor was using the proceeds of the loans from those banks in violation of Federal Reserve Board Regulations. We do not know—and need not decide—whether there is any merit to these allegations. We find, however, that they make out a sufficient claim for a prima facie tort, alleging as they do, "infliction of intentional harm, resulting in damage without excuse or justification. . . ."

*Jewelcor's Preliminary Injunction Motion*

In this motion Jewelcor seeks preliminary injunctive relief against the Lafayette directors for alleged violations of §§ 14(a) and 13(d) of the Exchange Act. As we have noted at an earlier point, Jewelcor seeks to enjoin the Lafayette directors from (a) voting their Lafayette stock or purchasing additional stock until they file a Schedule 13D; (b) voting any proxies obtained by them based on purportedly false and misleading proxy materials; and (c) continuing to manipulate the price of Lafayette stock. Jewelcor also has requested an order overturning the vote in favor of Proposal No. 1 at Lafayette's annual stockholders meeting held November 21, 1974.

### The Alleged § 14(a) Violations

Jewelcor contends that the Lafayette directors were responsible for the issuance of false and misleading proxy materials in regard to Proposals No. 1 and 2 to be voted on at Lafayette's shareholders meeting.[20] Those proxy materials were sent out in October, November and December of 1974 and February, 1975.

Lafayette's proxy materials stated, *inter alia,* that "[t]o the best of the Company's knowledge, no other company is presently attempting to acquire control of the Company." Jewelcor argues that this statement was false and misleading, since Lafayette believed that Jewelcor was ready to stage an imminent takeover of Lafayette.[21] We find that Jewelcor is not likely to prevail on the merits, and thus we deny its motion for preliminary injunctive relief on this point. We find that there is a fair amount of evidence detailed in our discussion of Jewelcor's summary judgment motion suggesting that Jewelcor did not intend to take over Lafayette.[22] This evidence, if true, would suggest that Lafayette had a reasonable basis for asserting that it knew of no takeover attempt by Jewelcor.

Jewelcor contends that Lafayette's proxy materials were false and misleading in failing to state that the defendants had formed a group to perpetuate the Lafayette directors in office. For the reasons discussed below in our consideration of the alleged § 13(d) violations, we find that the proxy materials likely were materially false and misleading in failing to mention the defendants' group, but conclude that only limited preliminary injunctive relief is warranted.

█ Jewelcor also contends that the proxy materials failed to disclose that the Lafayette directors had prepared a tender offer for Lafayette stock for the purpose of going private in the event that Jewelcor made a tender offer, and had sought financing for such a tender. According to Jewelcor, defendants intended to finance this prospective tender offer with a loan made to Lafayette, buy out Lafayette's public shareholders, and then offer Lafayette shares to the public again after "the minority shareholders had been frozen out." (Jewelcor Brief in Support of Preliminary Injunction Motion at 33). There is evidence tending to show that Lafayette had considered a tender offer for its own stock, but there is also evidence indicating that it did not have present plans for such a tender

---

20. Jewelcor asserts that the proxy materials violated Rule 14a–9 promulgated by the SEC. That rule is set forth at pages 39–40, *supra.*

21. Jewelcor's position is logically flawed. On the one hand, Jewelcor contends that Lafayette's proxy materials were misleading for not indicating Lafayette's belief that Jewelcor was preparing to take it over, a view which Jewelcor consistently has maintained has no basis in fact. If Jewelcor is correct in declaring that it never intended to take over Lafayette, it is inconceivable that Lafayette would be required to disseminate such an inaccurate statement in order to comply with the federal securities laws. On the other hand, if Jewelcor did in fact have a specific intent to take over Lafayette, its principal defense to Lafayette's preliminary injunction motion must fall.

22. See pages 19–20, *supra.*

offer (Lavery, 38), and that "going private" was merely one alternative under consideration to combat a threatened takeover by Jewelcor. (Ferber, 24; Ex. V to Block Aff.). There was also evidence suggesting that Lafayette's interest in going private was not motivated by fears of a takeover by Jewelcor, but rather by concern about the unsatisfactory price of its stock. (Krimendahl, 26). In the absence of clear evidence that Lafayette had more than a contingency plan to make a tender offer for its own stock, we are of the opinion that such proxy disclosure was not required. *See* Texasgulf, Inc. v. Canada Development Corp., 366 F.Supp. 374, 423–424 (S.D.Tex.1973). While there may be sufficient evidence for Jewelcor to prevail on this point after a full trial on the merits, Jewelcor has not presented sufficient evidence at this juncture to warrant injunctive relief.

Jewelcor also charges that Lafayette's proxy materials failed to state that the proposed amendments were designed to prevent Jewelcor from seeking control of Lafayette and the concomitant purpose of entrenching the Lafayette directors in office. Lafayette's original proxy materials stated in part:

> The proposed amendments will serve to moderate the pace of any change in control of the Company, and better enable the Board of Directors to protect the interests of remaining shareholders in the event that another company should seek to acquire a controlling stock interest in the Company.

■ We find that even if Jewelcor's charge is well-founded,[23] the failure to state that the proposed amendments were designed to prevent Jewelcor from seeking control of Lafayette or entrenching the Lafayette directors in office was probably not a material omission in violation of § 14(a) and Rule 14a–9. *See* Crane Co. v. American Standard, Inc. [1967–69 Transfer Binder] CCH Fed.

Sec.L.Rep. ¶ 92,228 at 97,062–63, aff'd in pertinent part, 419 F.2d 787 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); Stedman v. Storer, 308 F.Supp. 881, 887 (S.D.N.Y. 1969); Elgin National Indus., Inc. v. Chemetron Corp., 299 F.Supp. 367, 372–73 (D.Del.1969).

In *Elgin*, the court rejected a contention that proxy statements were false and misleading in failing to advise stockholders that a purpose for certain amendments almost identical to those in the case at bar was the entrenchment of management in control. There, as here, the proxy statement did indicate that the effect of the proposed amendments was to make it more difficult for potential acquirers to obtain control of the board of directors. The court concluded that it was not:

> wrong for a corporation to solicit proxies which tend to maintain in office incumbent directors without saying as much. Many corporations do this. Some candidates for directorships in some corporations, to be sure, have devious and self-serving purposes in seeking to be reelected. But in other instances the purpose of solicitation of proxies in favor of incumbents is to maintain in office experienced people having intimate familiarity with the corporation's affairs. In the absence of some intended act of wrongdoing by candidates who seek reelection there appears to be no reason why the stockholders should be advised that the proposed amendment may tend to facilitate management perpetuating itself in control. Certainly it is not false and misleading for the management to fail to do so. It is an obvious fact which is disclosed whenever management solicits proxies in favor of itself.

Elgin National Indus., Inc. v. Chemetron Corp., *supra* at 373.

---

23. See *infra* p. 63, where we find persuasive evidence that defendants attempted to thwart a take-over attempt by Jewelcor.

In Stedman v. Storer, *supra,* the court concluded that it was:

> bemusing, and ultimately pointless, to charge that directors perpetuated a "material omission" when they failed to (a) discover and adjudge faithless motives for their actions and (b) announce such a discovery in reporting the products of their managerial efforts and judgment. The securities laws, while their central insistence is indeed upon disclosure, were never intended to attempt any such measures of psychoanalysis or reported self-analysis. The unclean heart of a director is not actionable, whether or not it is "disclosed," unless the impurities are translated into actionable deeds or omissions both objective and external.

Stedman v. Storer, *supra,* 308 F.Supp. at 887. Accordingly, we conclude that Jewelcor is not entitled to injunctive relief on this point.

■ Jewelcor also urges that the Lafayette directors' December and February proxy materials failed to update the October proxy materials to include information regarding subsequent stock purchases by defendants. Jewelcor contends that this omission was material, since the defendants, they say, were seeking to entrench themselves in control of the company and were contemplating a tender offer for Lafayette's stock. Lafayette, on the other hand, argues that this information was only relevant to the subject of the election of directors, a matter which was acted upon at the stockholders meeting on November 21. We agree with Lafayette that this information was not required to be reported. Rule 14a–9 requires updating of all proxy solicitations to "correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." Since the subject of the November 21 stockholders meeting was the election of directors—the only purpose for which disclosure of the amount of Lafayette stock held by Lafayette's directors was required [24]—it was unnecessary for Lafayette to update its proxy materials in this regard. The only subject remaining on the agenda at the adjourned stockholders meeting was Proposal No. 2, which did not directly relate to the election of directors. Thus, we must deny Jewelcor's motion on this ground.

■ Jewelcor also contends that Lafayette's November 27th proxy materials were false and misleading in stating that 61 percent of Lafayette's shareholders had voted for Proposal No. 2, when in fact no vote had been taken. Although perhaps Lafayette could have done a better job of draftsmanship, we do not find that this information was materially misleading, especially in light of the fact that Lafayette also disclosed that approval of Proposal No. 2 required the affirmative vote of 66⅔ percent of Lafayette's shareholders. We recognize that Rule 14a–9 includes as an example of what may be misleading within the meaning of the rule "claims made prior to a meeting regarding the results of a solicitation." However, we do not find that Lafayette's statement was clearly misleading in the present context. Moreover, it has been held in a similar situation that "[t]here is nothing prohibitory of a reporting in proxy material of the existing fact or status of the solicitation." Layritz v. Condec Corp. (S.D.Ohio 1967) (Slip Op., at 33).

■ Finally, Jewelcor maintains that Lafayette's November and December proxy materials were materially false and misleading for failing to amend the October proxy materials and inform shareholders that Lafayette believed that Jewelcor was actually attempting a takeover. Since Lafayette's February proxy materials informed its stockholders that it believed Jewelcor planned a

---

24. Schedule 14A, Item 6, specifically provides for disclosure by directors of their stock ownership in proxy materials relating to the election of directors.

takeover, any prior misinformation had been corrected before any harm had been done. *See* General Time Corp. v. Talley Industries, Inc., 283 F.Supp. 832, 835 (S.D.N.Y.), aff'd 403 F.2d 159 (2d Cir. 1968), cert. denied, 383 U.S. 1026, 89 S. Ct. 631, 21 L.Ed.2d 570 (1969). Accordingly, we conclude that Jewelcor is unlikely to prevail on this point at a trial on the merits.

### Alleged § 13(d) Violation

■ Jewelcor alleges, as we have noted, that on September 3, 1974, Pearlman, Curwin, LeKashman and Ball formed a group consisting of themselves, Lafayette's pension fund, the Pletman Estate, Amos Shuchman, Marc Pearlman, and Arthur Borden, in his capacity as executor of the Pletman Estate. Jewelcor claims that the defendants constituted a "group" within the meaning of § 13(d) and violated that section by not filing a Schedule 13D. The Lafayette directors contend that there never was any group, and, hence, there was never an obligation to file a Schedule 13D. To prevail on the merits, Jewelcor must establish by a preponderance of the evidence that a conspiracy came into being after September 3 with the purpose of preventing Jewelcor from acquiring control of Lafayette. GAF Corp. v. Milstein, 453 F.2d 709, 718 (2d Cir. 1971) cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). Jewelcor must establish that the defendants agreed to act in concert, but it need not establish that they took any affirmative steps in furtherance of that agreement. *Id.*

■ We find that there is enough evidence to support Jewelcor's theory that there was an agreement, and to lead to the conclusion that Jewelcor could prevail on the merits at trial. It is of course unlikely that there would be a firm written agreement by the defendants announcing their intentions to act in concert to thwart a takeover bid by Jewelcor. No such agreement is before us and Jewelcor thus must piece one together by drawing inferences from the acts and deposition testimony of defendants and others. It seeks to do so by painting a picture of a "battle plan" in which Lafayette's vice president Curwin was appointed "defense minister." The first plan of attack purportedly was developed at the September 3 meeting attended by Pearlman, Curwin, LeKashman, Unterberg, Towbin, Ball, and Borden, at which a strategy of countermeasures against Jewelcor was planned. (Block Aff. ¶¶ 14, 15). One of the first defensive moves, Jewelcor contends, was a gratuitous contact with one of its banks to discuss alleged misuse by Jewelcor of borrowed funds. Defendants' next alleged defensive tack was to order the purchase of "as many shares as possible" of Lafayette stock for Lafayette's pension fund. (Block Aff., Ex. F).[25]

Defendants' next alleged strategic move was a series of meetings with banks to discuss Lafayette's defensive measures against Jewelcor. At one such meeting, the shares of the Pletman Estate, Lafayette's largest shareholder, were described as "in friendly hands." (Block Aff., Ex. K). At another meeting Pearlman told a bank official that the executors of the Pletman Estate "would side with existing management in the event of any controversy over who would control Lafayette." (Baumberger, 37). Jewelcor plausibly suggests that this evidence demonstrates that the Pletman Estate was clearly part of defendants' group. We recognize that there is testimony that Pearlman himself was concerned about the extent of his control over the Pletman Estate, since the trustees—Borden, Ball, and the Chase Manhattan Bank—had a

---

25. This order was subsequently rescinded, and the 6,500 shares which had been purchased for the pension fund were taken by Amos Shuchman for his wife's account. During the period from September through November, 1974, Shuchman's wife purchased 7,600 shares of Lafayette (including the 6,500 from the pension fund transaction), but sold 8,600 Lafayette shares.

fiduciary responsibility to act on its behalf. (Donovan, 34). We also recognize that the Pletman Estate decided to support Lafayette's proposals at the annual shareholders meeting on the basis of a recommendation of its concededly neutral trustee, the Chase Manhattan Bank. However, we think this evidence deserves little weight since any action of the Pletman Estate had to be approved by a majority vote of the trustees, which necessarily included either Borden or Ball, both of whom served as counsel to Lafayette and received a healthy retainer. Moreover, both had a direct interest in Lafayette since Ball had been a Lafayette director since 1961 and Borden was elected a Lafayette director on November 21, 1974. In addition, since the Pletman Estate was formed, Ball has received an annual fee for unspecified consulting services to Lafayette. Accordingly, any claims of independence and fiduciary responsibility in regard to the Pletman Estate must be viewed with some skepticism.

At about the same time defendants were allegedly meeting with banks to discuss countermeasures against Jewelcor, they met with the investment banking firm of Goldman, Sachs & Co. A meeting took place on October 18 attended by Pearlman, Curwin, Ball, Borden, Shuchman, and William Clarke, another attorney from Borden & Ball. (Krimendahl, 13). Notes taken during that meeting which were in Goldman, Sachs' files conclusively establish that the Lafayette directors were planning a series of countermeasures against Jewelcor. That document (Block Aff., Ex. O) has one section entitled "Takeover Defense Tactics," and is subdivided into "making acquisition of control more difficult," "make corporation less attractive to outsider," and "fight." On this page are listed various measures which were apparently considered by defendants. Some, such as buying stock on the open market, staggering terms of directors, and a

lawsuit, actually came to pass. Lafayette seeks to minimize its relationship with Goldman, Sachs by suggesting that the meeting was held to consider a general defensive posture against a potential takeover by Jewelcor or any possible third party. (Pearlman, 112–13). Under the circumstances, however, we do not find very persuasive the Lafayette directors' ostensible concern about third parties generally.

Shortly after this meeting, and apparently upon recommendation of Goldman, Sachs, Lafayette hired an investigative agency to investigate and report on Jewelcor. (Pearlman, 520).

After these meetings, Lafayette proposed the amendments to be acted upon at its November shareholders meeting. Those amendments were concededly designed to make a takeover of Lafayette more difficult.[26] Lafayette, of course, argues that those amendments were intended to thwart a takeover by *any* potential aggressor. The circumstances suggest otherwise.

Still another phase of the Lafayette directors' plan to oppose Jewelcor was the continued purchase by some members of the group of additional shares of Lafayette stock. Since December, Pearlman has purchased 39,900 shares, Ball 1000, and Curwin 900. Curwin stated at his deposition that he had never discussed his purchases with anybody at Lafayette (Curwin, 20–21), but Ball conceded that he might have mentioned his purchase of stock to Pearlman. While these purchases alone do not establish a conspiracy, taken together with the above evidence, it may be possible to prove that they were part of a concerted effort by the defendants to prevent Jewelcor from staging a takeover.

We find this evidence sufficient to enable us to conclude that the defendants may have violated § 13(d), since they did not file a Schedule 13D,[27] and

---

26. See discussion, page 14, *supra*.

27. We acknowledge that we have stated no particular acts with respect to some defend-

ants, and indeed, that some defendants may not have been part of the group. However, we also believe that the director defendants either agreed to "acquire, hold or dispose"

that Jewelcor is likely to prevail on the merits on this point after a full trial.

*Alleged Manipulation by Lafayette Directors*

Jewelcor seeks preliminary injunctive relief for alleged violations of § 9(a)(2) of the Exchange Act. Since we have dismissed Jewelcor's § 9(a)(2) claim (with leave to amend its complaint within ten days of this opinion),[28] we need not now consider whether Jewelcor might be entitled to injunctive relief if it had stated a legally sufficient claim.

*Injunctive Relief*

■ We have found that the Lafayette directors may have violated § 14 (a) by their failure to inform Lafayette shareholders if it is concluded at trial that they formed a group to perpetuate the Lafayette directors in office. Similarly, we have found that the Lafayette directors may have violated § 13(d) by their failure to file a Schedule 13D. Although Jewelcor is likely to prevail on the merits on these issues after a full trial, it does not necessarily follow that Jewelcor is entitled to injunctive relief. To obtain such a remedy, Jewelcor must also demonstrate that it will suffer irreparable harm, or that the balance of hardships tips decidedly in its favor. Sonesta International Hotels Corp. v. Wellington Assoc., *supra*, 483 F.2d at 250. *But see* Sampson v. Murray, *supra*, 415 U.S. at 88, 94 S.Ct. 937. Here, Jewelcor maintains that the irreparable harm it will suffer from the denial of its motion is that it will be precluded from attempting to acquire control of Lafayette if Proposal No. 2 is approved, and Proposal No. 1 allowed to remain.[29] Jewelcor also claims that it will be harmed by a denial of its request to enjoin further purchases of Lafayette stock by defendants, since such purchases will drive up

the price of Lafayette stock, and make the cost of a tender offer or future purchases by Jewelcor prohibitive. Finally, Jewelcor alleges that the denial of injunctive relief will enable Lafayette to "go private" by making a tender offer for its own stock. To determine whether irreparable harm or an inequitable balance of hardships will flow from a denial of injunctive relief, we must balance the equities. If Jewelcor's motion is granted, "no matter how such [relief] was explained to the shareholders by the present management, a substantial number of shareholders would regard its issuance as a determination of the alleged Securities Act violations on the merits and a finding that the incumbent management had acted improperly." D–Z Investment Co. v. Holloway, [1973–74 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,588, at 96,061–62 (S.D.N.Y.1974). Moreover, "to allow an annual meeting to proceed in the face of alleged misrepresentations and omissions in the proxy materials does not, of itself, work irreparable injury or yield unremediable consequences upon the party seeking its postponement." *Id.* at 96,061. *See also* Sherman v. Posner, 266 F.Supp. 871, 873–74 (S.D. N.Y.1966). Additionally, if Jewelcor's motion is denied, we foresee no immediate harm, and find that the hardships do not tip decidedly in its favor. This finding is based on our view that no immediate adverse consequences will flow from a denial of injunctive relief. Jewelcor will not be precluded from obtaining control of Lafayette; the amendments, if approved and allowed to stand, will merely make such change of control more difficult. Jewelcor would still be free to pursue a "friendly" tender or merger with Lafayette. Moreover, denial of Jewelcor's motion will not give Lafayette license to make a tender offer for its own stock. If Lafayette pur-

---

of Lafayette securities, or (in the case of directors elected November 21, 1974) ratified the actions of their predecessors.

**28.** See discussion, pages 46–48, *supra*.

**29.** Jewelcor also contends that the value of its block of Lafayette stock will be reduced substantially if the Lafayette amendments are approved. We find this contention is without merit, since, assuming that it is true, money damages would be in order.

sues such a course, it must file the appropriate statements required by the federal securities laws, and Lafayette shareholders will be given a full opportunity to assess that tender offer at a later date.

Finally, we are concerned that Jewelcor will be irreparably harmed if defendants continue to purchase Lafayette stock without proper disclosure, since such purchases may well make it impossible for investors to "assess the potential for changes in corporate control and adequately evaluate the company's worth," GAF Corp. v. Milstein, *supra*, 453 F.2d at 717 (footnote, citation omitted), and thus effectively frustrate the relief intended to be provided by § 13(d). Accordingly, we hold that Jewelcor is entitled to the limited relief of an order enjoining defendants from purchasing stock of Lafayette until they file a Schedule 13D with the SEC and the American Stock Exchange.[30]

So ordered.

30. We believe that this limited grant of injunctive relief is consistent with our denial of injunctive relief regarding shares and proxies to be voted at the shareholders meeting scheduled for April 29. As indicated above, we are mindful of the effect upon Lafayette shareholders of a grant of injunctive relief, and have sought to minimize that effect in the event that after a trial on the merits it is shown that there was no group.